UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

PRODUCTION DESIGN SERVICES, INC.,

    Plaintiff,

vs.

SUTHERLAND-SCHULTZ, LTD.,

    Defendant.

Case No. 3:13-cv-338

Magistrate Judge Michael J. Newman
(Consent case)

**ORDER AND ENTRY: (1) SETTING FORTH THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW; (2) DIRECTING THAT FINAL JUDGMENT BE ENTERED IN FAVOR OF PLAINTIFF PRODUCTION DESIGN SERVICES, INC. FOR $526.13; (3) DIRECTING THAT THE PARTIES MAY SUBMIT MOTIONS FOR ATTORNEY'S FEES WITHIN 30 DAYS FROM THE ENTRY OF THIS ORDER; AND (4) TERMINATING THIS CASE ON THE COURT'S DOCKET**

This civil consent case came before the Court for a seven (7) day bench trial in August and November 2015. Docs. 80-87.[1] Attorney John Folkerth represented Plaintiff Production Design Services, Inc. ("PDSI") at trial. Attorney Richard Carr, Jr. represented Defendant Sutherland-Schultz, Ltd. ("S-S") at trial. Following trial, the parties simultaneously filed proposed findings of fact and conclusions of law. Docs. 89, 90. Thereafter, the parties filed memoranda in response thereto. Docs. 91, 92. The undersigned has carefully considered all of the foregoing, as well the evidence presented and admitted at trial, and this case is now ripe for issuance of the Court's findings of fact and conclusions of law as required under Fed. R. Civ. P. 52(a)(1).

---

[1] The parties originally estimated that trial would take approximately five days. *See* doc. 61 at PageID 1892. However, as trial progressed, the need for additional time was required. Due to the unavailability of witnesses from Canada following the fourth day of trial on August 28, 2015, the Court and the parties jointly agreed to reset trial to commence on November 2, 2015. *See* doc. 84.

## PROCEDURAL BACKGROUND[2]

On August 27, 2013, PDSI brought claims for breach of contract, *quantum meruit* and unjust enrichment against S-S in the Montgomery County, Ohio Court of Common Pleas. Doc. 3. PDSI sought recovery of contract damages, compensation for lost revenue, reasonable attorney's fees and costs. *Id*. Invoking federal subject matter jurisdiction based on diversity of citizenship, S-S timely removed the case to this Court on October 1, 2013. Doc. 1. On October 8, 2013, S-S filed an Answer and asserted counterclaims against PDSI for breach of contract and breach of warranty. Doc. 5.

Thereafter, the parties conducted extensive discovery in both the United States and Canada. The parties both filed motions for summary judgment. Docs. 35, 36. Judge Rice denied the motion for partial summary judgment filed by S-S. Doc. 39. Judge Rice denied in part and granted in part the motion for summary judgment filed by PDSI. *Id*.

On August 24, 2015, the parties unanimously consented to proceed to trial in this case before the undersigned. Doc. 67. Judge Rice subsequently ordered the case referred to the undersigned on August 25, 2015 for trial and final disposition. Doc. 68. The same day, the parties stipulated to a waiver of trial by a jury and withdrew all demands for jury trial. Doc. 70. Trial to the undersigned commenced on August 25, 2015 and continued until August 28, 2015, at which time the proceedings were recessed due to the unavailability of witnesses in Canada. Docs. 80-83; *see also supra* n.1. Trial subsequently recommenced on November 2, 2015, and continued each day until its conclusion on November 5, 2015. Docs. 84-87.

---

[2] These background facts are not disputed by the parties. *See* doc. 92 at PageID 3408-09.

**FINDINGS OF FACT**

1. This civil case arises from a contract dispute between PDSI and S-S. PDSI is an Ohio corporation with its principal place of business in West Carrollton, Ohio. Doc. 39 at PageID 1058. PDSI -- in addition to providing engineering services -- manufactures specialty equipment in the automotive (and other) industries/industry, including robotic systems, manufacturing control process instruments, machine tools, dies, jigs, fixtures and accessories. *Id*. S-S is a corporation located in Ontario, Canada, which provides industrial, commercial and institutional construction and installation services, including construction and installation services at the Honda facility in Alliston, Ontario ("Honda Alliston"), where Honda produces various models of its Honda and Acura vehicles. *Id*.

2. In 2012, Defendant S-S, under its contract with Honda, began a project for Honda to purchase and install a pre-delivery inspection conveyor ("PDI conveyor") at Honda Alliston. *See* doc. 3 at PageID 48; doc. 4 at PageID 65. The purpose of the PDI conveyor was -- after installation in a pre-dug pit in the floor of the Honda Alliston facility -- to slowly move newly manufactured vehicles over a distance within the Honda Alliston facility so that Honda personnel could perform a final vehicle inspection at the conclusion of the manufacturing process and immediately before shipment. Doc. 82 at PageID 2502; doc. 84 at PageID 2693.

3. In November 2012, in response to S-S's request for a quote ("RFQ"), PDSI generated a quotation to design and build the PDI conveyor for the Honda Alliston facility. *See* doc. 84 at PageID 2684-85; doc. 86 at PageID 3103; PX3.

4. On January 4, 2013, S-S countered PDSI's quote with certain modifications set forth in a purchase order, which PDSI later accepted. PX4. The contract between the parties required PDSI to supply and fabricate the PDI conveyor "in complete accordance with the

project plans, specifications, drawings and addendums issued by Honda Alliston." *See id*. The project scope, including plans and specifications, were set forth in a number of documents, including a document titled "PDI Renewal Project Revision 6" (hereinafter "Honda Project Description"). *See* DX2.

5.      The PDI conveyor itself is approximately 200 feet long and is operated from a touch screen computer control panel located at the exit end of the conveyor. Doc. 80 at PageID 2219, 2221; PX167, PX185. The conveyor was designed to carry a continuous load of up to ten vehicles through final inspections. Doc. 83 at PageID 2529. Vehicles are driven onto the conveyor at the "take-up" end by Honda employees, and then driven off at the opposite exit end -- again, by Honda employees.

6.      A main drive motor is located under the exit end of the conveyor, and two "take-up drive" motors are located under the conveyor at the entrance. Doc. 80 at PageID 2221-22; doc. 81 at PageID 2300-01. Honda specifications required that PDSI install SEW Eurodrive motors rated IP65 -- a specific rating for preventing water and dust intrusion into the motor -- because, as all parties were aware at all times, the motors would be exposed to water dripping from wet vehicles onto the conveyor. PageID 2447, 2700-01, 2808.

7.      The undisputed terms of the contract between PDSI and S-S required S-S to pay PDSI a total of $457,000 for the PDI conveyor in three installments: (1) 30% in conjunction with the purchase order; (2) 60% upon delivery; and (3) 10% upon final acceptance. *See id*. Following that purchase order, S-S issued a second purchase order with a base charge of $3,520.00 to PDSI for wear inserts. *See* PX 146.

8.      Under the terms of the parties' contract, after Honda's acceptance, PDSI would provide an express warranty of "equipment of its manufacture to be free from defective material

and workmanship for a period of twelve months . . . when given normal and proper usage and while owned by [Honda]." PX4.  The contract did not include any express waiver of implied warranties.  *Id*.; *see also* Sale of Goods Act, Revised Statutes of Ontario ("R.S.O."), c. S.1, s. 15 (stating that "[a]n express warranty or condition does not negative a warranty or condition implied by this Act unless inconsistent therewith").

9. The Honda Project Description states that "[f]inal acceptance of the equipment will occur sixty (60) days after successful commissioning and correction of all deficiencies to [Honda's] satisfaction and 1 full week with zero equipment related downtime." DX2.

10. The PDI conveyor arrived at Honda Alliston in mid-to-late February 2013.  Doc. 82 at PageID 2513.   Initial installation of the PDI conveyor occurred between February 19, 2013 and March 4, 2013.  DX 31-10, DX 70-7 to 70-15.  PDSI employees Pat Roseberry and Allan Abbott provided installation and start-up support at Honda from February 25 through March 8, 2013.  Doc. 82 at PageID 2513.

11. The PDI conveyor began mass production in the days before March 8, 2013.  PX 30.  On March 8, 2013, PDSI's start-up support work was complete.  *See id*.

12. On March 11, 2013, David Scott, Honda's project manager on the PDI conveyor project, sent an email to Honda, S-S, and PDSI personnel involved in the project.  *See* PX 30.  That email states:

> I would like to say thank you to everyone who helped out with the PDI project over the last few months.  All of the assistance from presentations, planning, arranging the temporary route, manufacturing the conveyor, preparing and installing, to commissioning was a great help to get the PDI to mass pro.  Pleas extend this thank you to all of the associates for their patience and those that supported production during the construction period and all of the people from Sutherland Shultz and PDSI for their hard work and commitment to making this project a success.

*Id*. This email evidences successful commissioning of the PDI conveyor; it does not evidence final acceptance of the conveyor by Honda. *See infra*. At the time this email was sent and for some time thereafter, Honda encountered a number of problems and deficiencies with the PDI conveyor that required PDSI's corrective action to bring it within Honda's specifications. Doc. 81 at PageID 2386-2417, doc. 85 at PageID 2855-70.

13. One specific problem arose on March 22, 2013, when the chain on the main motor drive slipped. PX 34; doc. 83 at PageID 2627-28; doc. 84 at PageID 2712-13. The Court finds that this was an error in the manufacture and fabrication of the PDI conveyor because the motor bolts were not properly torqued by PDSI. *See* doc. 87 at PageID 3181-83.

14. On April 15, 2013, the chain conveyor belt broke as a result of Honda's PDI conveyor operator repeatedly resetting the conveyor and attempting to restart it after a fault shut it down. Doc. 81 at PageID 2300-01. Unknown to the Honda employee, a brake breaker at the take-up end of the conveyor had tripped, causing the conveyor to stop and display a fault on the computer control panel. *Id*. at PageID 2301. The fault message, however, did not inform the operator that fault was specifically caused by the tripping of a breaker. Doc. 82 at PageID 2441. Further, nothing in the operator's manual created by PDSI informed an operator to check breakers when an unidentified fault occurred. *Id*. at PageID 2438, 2463. After the chain belt break on April 15, 2013, the programming was corrected to specifically inform the operator if a fault was caused by a breaker tripping. *Id*. at PageID 2441. The Court finds that this incident resulted from a programming error by PDSI; specifically, the programming did not meet Honda's specifications requiring that the "PLC . . . annunciate when the disconnect is off" and requiring that "[m]otors cannot be restarted by switching on the disconnect alone." *See* DX 8.

15. On April 17, 2013, a disconnect box on the conveyor failed as a result of corrosion -- caused by water intrusion -- inside the take-up drive 2 motor brake. *See* doc. 87 at PageID 3263-87. This corrosion inside the motor brake caused the resistance of the motor brake to decrease and the current running through the motor brake to increase. *See id*. The resulting increased amperage through the disconnect box caused an internal arcing within the box. *Id*.[3]

16. Honda specifications required that the take-up drive motors meet certain water and dust intrusion standards because they were being used in a wet environment. *See* doc. 84 at PageID 2701. Specifically, Honda's specification required use of motors rated IP65. *See* doc. 87 at PageID 3266. Without dispute, the SEW Eurodrive motors originally purchased and installed by PDSI did not meet the IP65 rating required by Honda -- *i.e.*, they did not provide sufficient water resistance -- and needed to be replaced. Doc. 83 at PageID 2619-20. In other words, failure of the disconnect box was a result of PDSI installing take-up drive motors that did not meet Honda's specifications. *See* doc. 87 at PageID 3263-87.

17. SEW Eurodrive supplied new motors, which were installed in or about July 2013. Doc. 81 at PageID 2355; DX 20. S-S installed the new motors at its own cost. DX 20.

18. As set forth more fully below, Honda's final acceptance of the PDI conveyor occurred sometime after the new motors were installed in July 2013, and did not occur at any time before July 2013. *See infra*.

---

[3] PDSI argues that the disconnect box was improperly installed with conduit entering the top of the box and the box being placed in a wet environment. PDSI contends that an apparent arcing and fire inside the disconnect box occurred as a result of water entering the box. Having weighed the evidence -- including the expert testimony presented by both parties -- the Court finds that such a theory lacks credibility. Although PDSI points to evidence of water being in the box, the Court notes that, after the disconnect failure, Honda ran the conveyor with the disconnect box bypassed and the box open in the wet environment. Thus, the Court finds, after weighing the evidence, that any water noted in the disconnect was water entering after the disconnect failure.

19. S-S suffered $41,008.31 in damages as a result of the work it performed to correct deficiencies with the PDI conveyor, including torqueing motor bolts, correcting software, replacing the belt chain and associated damage, replacing the motors and associated damage. *See* DX 20.

20. To date, S-S has paid $419,443.16 to PDSI. *See* doc. 90 at PageID 3351. PDSI claims that S-S owes $37,556.84 on the original purchase order. *See* doc. 90 at PageID 3352. PDSI also claims that S-S owes $3,977.60 on a separate purchase order for wear inserts. *Id*. at PageID 3353. Thus, the total balance PDSI claims is on purchase orders issued by S-S is $41,534.44. *See* doc. 86 at PageID 3076.

21. PDSI also claims that S-S should pay $24,013.00 for additional work performed in response to the belt breaking and disconnect failure incidents. *See* doc. 90 at PageID 3353. PDSI seeks recovery of this amount on a *quantum meruit* claim.

**CONCLUSIONS OF LAW**

1. A significant point of contention in this case is when and whether "final acceptance" occurred. Although there is no dispute that the motors in the PDI conveyor did not meet Honda's specifications, PDSI argues that the conveyor was accepted on or about March 8, 2013 and, therefore, S-S's remedies are limited to damages for breach of warranty. *See* doc. 91 at PageID 3402-03. PDSI also argues that the express warranty in the contract does not cover the motors because those motors were not "of its manufacture," and instead were manufactured by SEW Eurodrive. *See* PX4. PDSI further disclaims applicability of any implied warranties under Ontario law. *See* doc. 91 at PageID 3402-03.

2. The parties have stipulated that Ontario law governs the dispute in this case. *See* doc. 39 at PageID 1066. PDSI is correct that, under Ontario law, "[w]here the buyer has

8

accepted the goods, the breach of any condition to be fulfilled by the seller can thereafter be treated only as a breach of warranty and not as a ground for rejecting the goods and treating the contract as repudiated by the seller, unless there is a term of the contract to that effect[.]" *Nordic Aero Services Inc. v. Air Canada*, 1995 CarswellOnt 334.  In other words, following acceptance, "the buyer can only sue for damages on the basis of a breach of warranty." *Id*.

      3.      Pursuant to the Ontario Sale of Goods Act,[4] "[t]he buyer shall be deemed to have accepted the goods when the buyer[:] (a) intimates to the seller that the goods have been accepted; (b) after delivery, does any act in relation to them that is inconsistent with the ownership of the seller; *or* (c) after the lapse of a reasonable period of time, retains the goods without intimating to the seller that they have been rejected." Sale of Goods Act, R.S.O. 1990, c. S.1, s. 34 (emphasis added).  PDSI contends that, pursuant to standard practice in the industry, acceptance occurred on or about March 8, 2013, when Honda informed PDSI that start-up services were complete.  *See* doc. 90 at PageID 3338.

      4.      S-S argues that acceptance did not and could not have occurred on March 8, 2013 because such date would not meet the specific definition of "final acceptance" as set forth in Honda's Project Description, *i.e.*, "sixty (60) days after successful commissioning and correction of all deficiencies to [Honda's] satisfaction and 1 full week with zero equipment related downtime." DX2.  PDSI concedes that the Honda Project Description forms part of the contract between the parties.  *See* doc. 91 at PageID 3364.  PDSI nonetheless contends that this specific definition of "final acceptance" does not apply because the Honda Project Description was

---

[4] The parties both seek to apply portions of the Ontario Sale of Goods Act.

9

incorporated into the contract[5] between PDSI and S-S only insofar as it contains "project plans, specifications, drawings and addenda issued by Honda Alliston." Doc. 91 at PageID 3364-65.

5. Generally, "where the parties intend their writing to be the exclusive record of their agreement, their intention will prevail and no extrinsic evidence is admissible to vary or qualify the contract[.]" *General Refractories Co. of Canada v. Venturedyne Ltd.*, 2002 CarswellOnt 36. Courts must "give effect to the plain and ordinary meaning of the words used." *Id*. "If there are several documents comprising the agreement, they must be read together to discover the intention of the parties" and "[t]he court is to establish the intention of the parties from the words used[.]" *Id*.

6. Here, without dispute, the Honda Project Description formed part of the contract between PDSI and S-S. *See* doc. 91 at PageID 3364. When objectively reading all of the contract documents together, the Court concludes that the parties intended for final acceptance to occur -- as specifically defined in the contract documents -- "sixty (60) days after successful commissioning and correction of all deficiencies to [Honda's] satisfaction and 1 full week with zero equipment related downtime." DX2.

7. The contract between the parties does not specifically define the term "commission." The Canadian Oxford Dictionary defines "commission" as "bring[ing] (a machine, equipment, etc.) into operation." *See* THE CANADIAN OXFORD DICTIONARY 307-08 (2d ed. 2004). Based upon the plain and ordinary meaning of the word "commission," the Court finds that the PDI conveyor was "commissioned" on or about March 8, 2013.

---

[5] "The extent to which the terms of a principal contract have been incorporated by reference into a subcontract is, in every case, a question of construction of the subcontract[.]" *Dynatec Mining Ltd. v. PCL Civil Constructors (Canada) Inc.*, 1996 CarswellOnt 16, 25 C.L.R. (2d) 259 (Ont. Gen. Div.)). "A subcontractor is only bound by the terms of the prime contract to the extent its terms are referenced or incorporated in the subcontract[.]" *1510610 Ontario Inc. v. Man-Shield (NWO) Construction Inc.*, 2012 ONSC 302, 2012 CarswellOnt 1395.

8. Accordingly, "final acceptance," pursuant to the terms of the contract, could not have occurred before May 7, 2013, *i.e.*, 60 days after March 8, 2013. By that time, the chain belt had snapped, the disconnect box had failed, and the parties were investigating the root cause of those failures. *See* DX 79-30, PX7. It was during that investigation that the parties learned the take-up motors on the PDI conveyor built by PDSI did not comply with specifications because they lacked sufficient waterproof coating (thus allowing water to infiltrate and corrode the motors, leading to increased amperage in the disconnect box, an eventual arching event and failure of the box). *See* doc. 87 at PageID 3142. Thus, Honda did not accept the PDI conveyor before demanding corrective action by PDSI to bring the conveyor within specifications.

9. Even assuming, *arguendo*, that the definition of "final acceptance" in the Honda Project Description did not apply, the Court would still conclude that, under Ontario law, acceptance did not occur prior to S-S and/or Honda discovering the motors were incorrect. *See Waterloo Public Utilities Commission v. Burroughs Business Machines Ltd.*, 1974 CarswellOnt 565. "Acceptance is a question of fact." *See Nordic Aero*, 1995 CarswellOnt 334. Under Ontario law, "the more complex and novel the subject-matter of the sale, the more time is required to determine if it is fit or can be made fit for the purpose for which it was ordered." *Waterloo*, 1974 CarswellOnt 565.

10. In *Waterloo*, the court found no acceptance occurred where, "[f]rom the very outset following delivery of the [product,] the [buyer] encountered numerous breakdowns and down times in its use and [seller] sought solutions by which it could be made to meet the requirements of the [buyer] for which it had been ordered." *Id*. In that case, the court concluded that, despite the product having been delivered and used, it was nonetheless reasonable to

11

conclude that, under the circumstances, the seller still had not accepted the product approximately ten (10) months after delivery. *Id*.

11. Similar to *Waterloo*, the PDI conveyor here was not only a complex product, but contained intricate programming that all parties knew would require a period of "debugging." At the time of commissioning, and throughout the first two months of use, the PDI conveyor was fraught with deficiencies and problems that required PDSI's repeated corrective action. Not least among these deficiencies and problems was the lack of proper motors and the failure of the disconnect box. Based upon the facts and circumstances presented here, it is reasonable to conclude that acceptance did not occur until August 2013 when the correct motors were installed by S-S. *Cf*. *Waterloo*, 1974 CarswellOnt 565.

12. Section 14 of the Ontario Sale of Goods Act states, in relevant part, that "[w]here there is a contract for the sale of goods by description, there is an implied condition that the goods will correspond with the description." Sale of Goods Act, R.S.O. 1990, c. S.1, s. 14.[6] Here, this is a contact for the sale of goods by description. *See Hocaoglu v. North Front Motors (342732 Ontario Co.)*, 1984 CarswellOnt 3239 (stating that "the sale of a manufactured item will nearly always be a sale by description (except where it is second-hand) because articles made to an identical design are not generally bought as unique goods but as goods corresponding to that design"). Because the PDI conveyor did not comply with Honda's specifications -- namely, with regard to programming and motors -- PDSI breached this implied condition and S-S is entitled to damages.

---

[6] While S-S does not specifically cite this section of the Ontario Sale of Goods Act, that section governs the breach argued by S-S in this case. In the interest of justice, the Court applies that section despite S-S's failure to specifically cite it.

13. "Where a contract of sale is subject to a condition to be fulfilled by the seller, the buyer may waive the condition or may elect to treat the breach of the condition as a breach of warranty and not as a ground for treating the contract as repudiated." Sale of Goods Act, R.S.O. 1990, c. S.1, s. 12. "[W]here the buyer elects, or is compelled, to treat a breach of a condition on the part of the seller as a breach of warranty, the buyer . . . may . . . maintain an action against the seller for damages for the breach of warranty." Sale of Goods Act, R.S.O. 1990, c. S.1, s. 51(1). "The measure of damages for breach of warranty is the estimated loss directly and naturally resulting in the ordinary course of events from the breach of warranty." Sale of Goods Act, R.S.O. 1990, c. S.1, s. 51(2).

14. The Court concludes that S-S's loss directly and naturally resulting from PDSI's breach is $41,008.31 for costs S-S incurred to correct deficiencies in the PDI conveyor and to bring it within Honda's specifications (including, but not limited to, replacing motors, properly torqueing bolts, repairing the chain belt, and installing programming code). *See* DX 20. Accordingly, S-S is entitled to recover damages from PDSI in the amount of $41,008.31 for damages arising from PDSI's breach.

15. At "final acceptance," which occurred on or before August 2, 2013, S-S was contractually obligated to pay all outstanding amounts on the purchase orders between the parties. As set forth above, that amount is $41,534.44. *See supra*. Thus, PDSI is entitled to recover $41,534.44 from S-S on the contract.

16. Insofar as PDSI seeks to recover $24,013.00 under an unjust enrichment theory, such claim fails. To prevail on a claim of unjust enrichment under Ontario law, a plaintiff must show: "(1) enrichment of the defendant; (2) a corresponding deprivation of the plaintiff; (3) the absence of any juristic reasons for the enrichment[.]" *Cannington Excavating (1989) Ltd. v.*

13

*Odomatic Inc.*, 2000 CarswellOnt 2594. PDSI is not entitled to recover on an unjust enrichment theory against S-S because PDSI was in breach of its contract and S-S did not gain anything beyond what was originally bargained for. If any entity was "enriched" by PDSI, it was Honda, not S-S.

17. Ultimately, subtracting the amount PDSI owes to S-S from the amount S-S owes to PDSI results in PDSI being entitled to recover a total of $526.13.

## CONCLUSION

Based upon all of the foregoing, the Court concludes that PDSI is entitled to recover $41,534.44 from S-S. S-S is entitled to recover $41,008.31 from PDSI. In essence, judgment must issue in favor of PDSI for $526.13. The parties may submit motions for attorney's fees and applications for costs within 30 days from the entry of this Order. The Clerk is **ORDERED** to enter judgment accordingly -- in favor of Plaintiff PDSI for $526.13 -- and **TERMINATE** this case on the Court's docket.

**IT IS SO ORDERED.**

Date:   March 25, 2016                              *s/ Michael J. Newman*
                                                    Michael J. Newman
                                                    United States Magistrate Judge